FILED
UNITED STATES DISTRICT COURT CLERKS OFF
DISTRICT OF MASSACHUSETTS

2004 MAY 26  P

|  |  |
|---|---|
| FUTURISTIC BRANDS USA, INC., | ) U.S. DISTRICT COURT |
|  | ) DISTRICT OF MASS. |
| Plaintiff, | ) |
|  | ) |
| v. | ) Civil Action No. 04-cv-10303RWZ |
|  | ) |
| LEADING BRANDS, INC., and | ) |
| RALPH McRAE, | ) |
|  | ) |
| Defendants. | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
COMPLAINT FOR LACK OF PERSONAL JURISDICTION**

### INTRODUCTION

Ever since 2003, Ralph McRae and Leading Brands, Inc. ("Leading Brands") have been

intimately and directly involved in dealing with three businesses[1] with offices in Massachusetts.

Mr. McRae has engaged in detailed and extensive communications and negotiations with these

businesses in Massachusetts; indeed, he has personally come to Massachusetts in connection

with those dealings. He has also taken actions to interfere with contracts with these companies,

thereby causing direct damage in the Commonwealth. For its part, Leading Brands represented

in filings with the Securities and Exchange Commission that it operates throughout the United

States. In fact, it has extensive contacts with Massachusetts through the actions of its wholly-

owned subsidiary, Leading Brands of America, Inc. ("LBAI"), over which it has exercised

pervasive control.

---

[1]      The three businesses are the plaintiff, Futuristic Brands, USA, Inc. ("Futuristic"), Zemper International,
S.A. ("Zemper"), and New Sun Beverages Corporation (USA), Inc. ("New Sun").

## FACTUAL BACKGROUND

1.      Thomas Lines, an authorized representative of Futuristic Brands USA, Inc. ("Futuristic"), has a home and offices in Massachusetts. Affidavit of Thomas Lines ("Lines Aff.") ¶ 1, which is being filed together herewith.

2.      Since June 2003, Mr. Lines has been regularly present in Massachusetts, supervising the business of Futuristic. Lines Aff. ¶ 2.

3.      Futuristic is the exclusive licensee with the right to sublicense and distribute the Mad Croc $^{TM}$ Energy Drink ("Mad Croc $^{TM}$"). Lines Aff. ¶ 3.

4.      During the early part of 2003, Futuristic began negotiating with Leading Brands of America, Inc. ("LBAI") to license the sale of Mad Croc $^{TM}$ in North America. On March 19, 2003, LBAI and Futuristic entered into a license agreement (the "License Agreement"). Lines Aff. ¶ 4.

5.      The bulk of these negotiations took place in Massachusetts. Mr. Lines received phone calls and other types of communications from LBAI in Massachusetts. Lines Aff. ¶ 5.

6.      Indeed, LBAI was also negotiating for two other license agreements with other entities with representative offices in Massachusetts and New York. The bulk of those negotiations also took place here in Massachusetts. Lines Aff. ¶ 6.

7.      Under the terms of the License Agreement, LBAI had the exclusive right to use the Mad Croc $^{TM}$ trademark in connection with the marketing, distribution and sale of Mad Croc$^{TM}$ and promotional items associated with Mad Croc $^{TM}$ within North America subject to the terms and conditions of the License Agreement. Futuristic had the right to nominate a manufacturer for the product, and nominated DIS B.V. as such manufacturer. Lines Aff. ¶ 7.

2

8.      After the License Agreements were executed, there were continuing communications about the course of LBAI's compliance with the terms of those agreements from and to Massachusetts. Lines Aff. ¶ 8.

9.      Between February and October of 2003, Mr. Lines had regular contact by telephone and email with Ralph McRae. Lines Aff. ¶ 9.

10.     On at least two occasions, Mr. McRae visited Mr. Lines personally in Massachusetts in connection with business. Lines Aff. ¶ 10.

11.     Mr. McRae is the Chairman and President of LBAI. Lines Aff. ¶ 11.

12.     As 2003 passed, Leading Brands, the parent company of LBAI, and Mr. McRae took steps to cause LBAI to functionally cease to exist. Without notice to Futuristic – or indeed any other public announcement or SEC filing – Leading Brands and Mr. McRae closed LBAI's Connecticut office without opening any new office. Communications to LBAI began to be returned to Mr. Lines and his attorneys. Various LBAI employees had been terminated due to a lack of success in LBAI's business. Lines Aff. ¶ 12.

13.     As part of his campaign of commercial sabotage and vituperation, Mr. McRae made knowingly false allegations against Mr. Lines to federal law enforcement officials and other third parties. Mr. McRae made those allegations or arranged for them to be made knowing them to be untrue and as part of an effort to interfere with the commercial operations of Futuristic and undermine its principals here in Massachusetts. Lines Aff. ¶ 13.

14.     After the resignation of Mr. Robert Miller, the former president of LBAI, in August, Mr. McRae had further direct communications with Mr. Lines here in Massachusetts. Among other falsehoods, he informed Mr. Lines that he intended to terminate Mr. Miller for theft, told Mr. Lines that Mr. Miller had not been terminated yet, did not tell Mr. Lines that Mr.

Miller had in fact resigned, and said that he wished Mr. Lines to change the terms of the License Agreement in order to allow him to terminate Mr. Miller without prejudice to LBAI's position. Mr. Lines told Mr. McRae in the presence of a witness that he would be very happy to remove the Miller key-man clause from the License Agreement if LBAI would comply with the rest of the License Agreement as it was not doing at that time.

15.    Mr. McRae and Mr. Lines then attempted to negotiate the modification of the License Agreement, which involved communications to and from Massachusetts. It was later confirmed with Mr. Miller that he had in fact resigned before Mr. McRae's visit to Boston when Mr. McRae misled Mr. Lines into believing that Mr. Miller was a thief who needed to be terminated from his employ hence Mr. McRae's request to remove the Miller key-man clause. At that time, there were other parts of the License Agreement in dispute so Mr. Lines sent a without-prejudice re-draft of the License Agreement to Mr. McRae excluding the Miller key-man clause. Two days after Mr. Lines sent the re-draft, Mr. McRae brought a lawsuit against Mr. Lines, Mr. Miller and others in Connecticut Superior Court (the "Connecticut State Court Action"), which suit has since been withdrawn. Lines Aff. ¶ 14.

16.    According to LBAI's own Complaint filed in the Connecticut State Court Action, Mr. McRae personally worked on the Business Plan for LBAI's activities in the United States, including Massachusetts. In the same Complaint, it is admitted that Mr. McRae and Mr. Lines had direct communications in 2003. Lines Aff. ¶ 15.

17.    A Form 20-F filed by Leading Brands with the Securities and Exchange Commission states, "Leading Brands, Inc. ("LBI") *and* its subsidiaries are engaged in the bottling, distribution, sales, merchandising and brand management of beverage and food

products *throughout most of North America*." Lines Aff. ¶ 16. According to the same document, Leading Brands purchases much of its supplies from the United States. *Id.*

18.    Leading Brands regularly made payments on behalf of LBAI. Lines Aff. ¶ 17. For instance, payments were made to DIS B.V. by checks drawn on a Leading Brands' bank account in Chicago, Illinois. Lines Aff. ¶ 17. Leading Brands also made payments by wire transfer on behalf of LBAI. *Id.*

19.    LBAI is a wholly owned subsidiary of Leading Brands. When LBAI was originally established, it had physical offices in Connecticut, a president, and a variety of employees. Affidavit of Evan Slavitt ("Slavitt Aff.") ¶¶ 2a, 2b, which is being filed together herewith.

20.    The License Agreement with Futuristic, like the License Agreements with other companies, was not signed with the anticipation by LBAI or Leading Brands that they would be making the best efforts on behalf of the Futuristic product, but to create a ready source of cash to divert to the promotion of other Leading Brands' products. Slavitt Aff. ¶ 2c.

21.    When Robert Miller, the then-LBAI president, sought funds to comply with the terms of the License Agreement, Mr. McRae refused. Slavitt Aff. ¶ 2d.

22.    All or substantially all of LBAI's funds were controlled by Leading Brands and no one at LBAI had authority to disburse funds. Slavitt Aff. ¶ 2e.

23.    LBAI deposited its funds in a lockbox account that was swept daily with the funds being transferred to Leading Brands. Slavitt Aff. ¶ 2f.

24.    Mr. McRae dictated or attempted to dictate the terms of all contracts that LBAI signed. Slavitt Aff. ¶ 2g.

25.    In August of 2003, Mr. Miller, resigned and Mr. McRae took over direct plenary control of LBAI which he exercises to the present day.  Slavitt Aff. ¶ 2h.

26.    After Mr. Miller resigned, Mr. McRae fired or caused the termination of most of the staff of LBAI.  Slavitt Aff. ¶ 2i.

27.    After Mr. Miller resigned, Mr. McRae closed the Connecticut office of LBAI.  To the extent it now has offices at all, it is simply the addresses of sales representatives who work at the direction of Mr. McRae.  Slavitt Aff. ¶ 2j.

28.    All decisions concerning the litigation in which LBAI is a party are made by Mr. McRae.  Slavitt Aff. ¶ 2k.

29.    Mr. McRae is listed as the contact person for press releases issued by Leading Brands concerning the litigation involving LBAI.  Slavitt Aff. ¶ 2l.

30.    Mr. McRae is the Chairman, President and Chief Executive Officer of Leading Brands.  Slavitt Aff. ¶ 2m.

31.    Futuristic believes that further discovery will confirm that LBAI is a mere instrumentality or alter ego of Leading Brands and that Mr. McRae has personally and directly engaged in the conduct that is at issue.  Futuristic believes that discovery will also indicate that for at least six months, and possibly longer, LBAI has had no meaningful control over its finances or operations, that its assets are far below its liabilities, that revenues have been diverted to Leading Brands, and that there is no meaningful distinction between Leading Brands and LBAI.  Slavitt Aff. ¶ 3.

## ARGUMENT

### I.    *Futuristic Must Only Proffer Prima Facie Evidence of Jurisdiction.*

In considering a motion to dismiss for lack of personal jurisdiction, the plaintiff is generally held to a fairly low threshold.  It is true that Futuristic cannot merely rely on the allegations in the Complaint.  On the other hand, it need only put forward such evidence that, if believed, would support jurisdiction.  "The district court, faced with a motion to dismiss for lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), may choose from among several methods for determining whether the plaintiff has met this burden."  *Foster-Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 145 (1st Cir. 1995); *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 674-75 (1st Cir. 1992).  The most conventional of these methods, known as the "prima facie" method, *Foster-Miller*, 46 F.3d at 145,[2] "permits the district court 'to consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction.'"  *Foster-Miller*, 46 F.3d at 145 (quoting *Boit* at 675).  *See, Brookfield Mach, Inc. v. Calbrit Design*, 929 F. Supp. 491, 494 (D. Mass. 1996).  The First Circuit recently confirmed this low threshold.  *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50-51 (1st Cir. 2002).  As the First Circuit explained the process, "[the Court] 'must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing.'  *Foster-Miller*, 46 F.3d at 145.  We take these facts 'as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim.'  *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998); *see also Sawtelle v. Farrell*, 70 F.3d 1381, 1385-86 (1st Cir. 1995); *Landmark Bank v. Machera*, 736 F. Supp. 375, 380 (D. Mass. 1990).  'We then add

---

[2] The other methods are not relevant to the instant dispute. *See Foster-Miller*, 46 F.3d at 145-46.

to the mix facts put forward by the defendants, to the extent that they are uncontradicted.' *Mass. Sch. of Law*, 142 F.3d at 34." *Daynard,* 290 F.3d at 51.

## II.    This Court Has General Jurisdiction Over Defendants.

"General jurisdiction exists when the defendant has engaged in 'continuous and systematic activity' in the forum, even if the activity is unrelated to the suit." *Daynard*, supra, at 52 (*citing with approval United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088 (1st Cir. 1992)). Here, Leading Brands, through LBAI and McRae, engaged in precisely such systematic activity in Massachusetts.

Leading Brands cannot have its cake and eat it too. In its own filings with the SEC, Leading Brands goes out of its way to make its international scope clear. "Leading Brands, Inc. ("LBI") *and* its subsidiaries are engaged in the bottling, distribution, sales, merchandising and brand management of beverage and food products *throughout most of North America*." Lines Aff. ¶ 16. Thus, Leading Brands asserts not just that its subsidiaries operate throughout the United States, but that it does so directly. Having made such a statement, Leading Brands must live by the consequences; it is simply wrong for it to assert operations throughout the United States when it is convenient, but then deny them when that is convenient.

Similarly, Mr. McRae is not just an officer of Leading Brands, he is the CEO of LBAI. He personally directs it operations and acts on its behalf. There seems little doubt that LBAI is subject to suit in the Commonwealth. In fact, it has appeared and answered in a case currently pending in Suffolk Superior Court. Slavitt Aff. ¶ 1. Mr. McRae, having chosen not just to run the parent, but to run the subsidiary, cannot now disclaim the actions of LBAI for jurisdictional

purposes. The Complaint asserts tortious conduct – Mr. McRae is not shielded by the existence of LBAI as one of his tools.


### III.    This Court Has Specific Jurisdiction Over Defendants.

Specific jurisdiction is appropriate where a defendant has "'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984) and *Helicopteros*, 466 U.S. at 414).

### A.    Leading Brands Is Subject to Service under the Massachusetts Long-Arm Statute.

The first step in determining specific jurisdiction is whether service was appropriate under the forum's long-arm statute. Massachusetts long-arm statute states, in relevant part:

> A Court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's
>
> (a) transacting any business in this commonwealth; . . .
>
> (c) causing tortious injury by an act or omission in this commonwealth;
>
> (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue . . ., in this commonwealth . . . .

Mass. Gen. Laws ch. 223A, § 3(a), (c), (d). Futuristic can satisfy each of these possible bases for jurisdiction.

9

### 1.    *Leading Brands and McRae Transacted Business in Massachusetts.*

The "transacting any business" provision in the Massachusetts long-arm statute has been

construed broadly. *See United Electrical, Radio and Machine Workers of America v. 163*

*Pleasant Street Corp*, 960 F.2d 1080, 1086 (1st Cir. 1992); *Hahn v. Vermont Law School*, 698

F.2d 48, 50 (1st Cir. 1983); *Nova Biomedical Corp. v. Moller*, 629 F.2d 190, 193 (1st Cir. 1980);

*Bond Leather Co., Inc. v. Q. T. Shoe Mfg. Co., Inc.*, 764 F.2d 928, 931 (1st Cir. 1985).  In

essence, this provision embraces "any purposeful acts performed in Massachusetts, whether

personal, private, or commercial." *Johnson v. Witkowski*, 30 Mass. App. 697, 713, 57 N.E.2d

513, 523 (1991).

As is discussed hereafter, Leading Brands transacted business through its wholly-owned

and dominated subsidiary, LBAI.  Before turning to that issue, it is worth restating the point

made above that Leading Brands' own statements admit its contacts with this jurisdiction.

Leading Brands asserts activities throughout the United States.  Amongst those activities are the

licensing and marketing of beverages.  This action arises from those activities.  While Leading

Brands would now like to pretend it acted only through a subsidiary, that is not what it has told

the SEC or the investing public.

Leading Brands bases much of its argument on the premise that it is a Canadian

corporation with no offices or employees in the United States.  This narrow view overlooks the

impact of LBAI's activities in Massachusetts on the jurisdiction analysis.  Despite the general

rule that courts will respect the legal independence of a corporation and its subsidiary,

jurisdiction over a parent is often found based on the activities of its subsidiary.  As the First

Circuit explained,

> the fact of separate incorporation is not alone determinative of a court's
> constitutional power to assert personal jurisdiction over the parent based on the

subsidiary's activities; rather, "there is a presumption of corporate separateness that [may] be overcome by clear evidence." Escude Cruz, 619 F.2d at 905. Despite the fact that corporate entities are distinct and their veils unpierced, courts can -- and usually do – make an actual inquiry into the nature of the interrelationship before abandoning the jurisdictional quest.

In those cases where personal jurisdiction over the parent has been found to exist, there is invariably a "plus" factor -- something beyond the subsidiary's mere presence within the bosom of the corporate family. **Sometimes, the parent has utilized the subsidiary in such a way that an agency relationship between the two corporations can be perceived -- and that is enough.** *See, e.g., Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 420 (9th Cir. 1977); *Milligan v. Anderson*, 522 F.2d 1202, 1205-07 (10th Cir. 1975); *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 492 (5th Cir. 1974); *Marsh v. Kitchen*, 480 F.2d 1270, 1272-73 (2d Cir. 1973); *see also* 4 C. Wright & A. Miller, Federal Practice and Procedures: Civil 2d § 1069, at 364-66 (1987) (listing cases). **On other occasions, jurisdiction has been premised on a finding of control** -- not merely the degree of control innately inherent in the family relationship, but the exercise of control by the parent "greater than that normally associated with common ownership and directorship." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983); *see, e.g., Product Promotions*, 495 F.2d at 493; *cf. Mangual v. General Battery Corp.*, 710 F.2d 15, 21 (1st Cir. 1983); *Volkswagen Interamericana. S.A. v. Rohlsen*, 360 F.2d 437, 441-42 (1st Cir.), cert. denied, 385 U.S. 919, 17 L. Ed. 2d 143, 87 S. Ct. 230 (1966). **The same result obtains when the subsidiary is merely an empty shell.** *See, e.g., Escude Cruz*, 619 F.2d at 905; *Wells Fargo*, 556 F.2d at 421.

*Donatelli v. National Hockey League*, 893 F.2d 459, 465-66 (1st Cir. 1990) (emphasis added).

Here, the facts presented by Futuristic, if credited, are sufficient to disregard the corporate distinction not only between Leading Brands and LBAI but also between LBAI and Mr. McRae. The License Agreement with Futuristic was not signed by LBAI with the anticipation of making the best efforts on behalf of the Futuristic product, but to create a ready source of cash to divert to the promotion of other Leading Brands' products. Slavitt Aff. ¶ 2c. This contention is consistent with the fact that all or substantially all of LBAI's funds are controlled by Leading Brands and no one at LBAI has authority to disburse funds. Slavitt Aff. ¶ 2e. LBAI deposits all of its funds in a lockbox account that is swept daily with the funds being transferred to Leading Brands. Slavitt Aff. ¶ 2f. In fact, when Robert Miller, the one-time

president of LBAI, sought funds to comply with the terms of the License Agreement, Mr. McRae refused. Slavitt Aff. ¶ 2d. Moreover, Leading Brands has regularly made direct payments on behalf of LBAI. Numerous payments have been made to DIS B.V. with checks drawn on Leading Brands' bank account in the United States, while other payments have been made by wire transfer directly from Leading Brands' accounts. Lines Aff. ¶ 17.

During 2003, Leading Brands took steps to cause LBAI to functionally cease to exist. After Mr. Miller resigned as LBAI's president, Mr. McRae took over direct plenary control of LBAI which he exercises to the present day. Slavitt Aff. ¶ 2h. Mr. McRae then closed LBAI's Connecticut office and fired or caused the termination of most of the staff of LBAI. Slavitt Aff. ¶ 2i, j; Lines Aff. ¶ 12. Communications from Futuristic to LBAI began to be returned. Lines Aff. ¶ 12. To the extent LBAI now has offices at all, it is simply the addresses of sales representatives who work at the direction of Mr. McRae. Slavitt Aff. ¶ 2j. All decisions concerning the litigation in which LBAI is a party are made by Mr. McRae. Slavitt Aff. ¶ 2k. In this regard, Mr. McRae is listed as the contact person for press releases issued by Leading Brands concerning the litigation involving LBAI. Slavitt Aff. ¶ 2l. In short, Leading Brands and McRae have stripped LBAI of its ability to live up to its obligations under the License Agreement, thereby causing substantial harm to Futuristic.

Once the basis for piercing exists at the minimal level required at the threshold of the litigation, the balance of the analysis is straightforward. Leading Brands cannot dispute that LBAI, its wholly-owned subsidiary transacted business in Massachusetts. During the early part of 2003, LBAI began negotiating with Futuristic to license the sale of Mad Croc™ in North America and eventually entered into the License Agreement for that purpose on March 19, 2003. Lines Aff. ¶ 4. The bulk of those negotiations took place in Massachusetts while Mr. Lines was

supervising Futuristic's business from its office in Massachusetts. Lines Aff. ¶ 5. At that same time, Futuristic was negotiating for two other license agreements with other entities with offices in Massachusetts, and the bulk of those negotiations also took place in Massachusetts. Lines Aff. ¶ 6. During the course of these negotiations, Mr. Lines routinely received phone calls and other types of communications in Massachusetts from LBAI. Lines Aff. ¶ 5.

After the License Agreement was executed, there were continuing communications about the course of LBAI's compliance (or, more properly, non-compliance) with the terms of the License Agreement from and to Massachusetts. Lines Aff. ¶ 8. Between February and October 2003, Mr. Lines had regular contact with Mr. McRae by telephone and email. Lines Aff. ¶ 9. On at least two occasions, Mr. McRae personally visited Mr. Lines in Massachusetts in connection with business. Lines Aff. ¶ 10. Furthermore, after Robert Miller resigned from LBAI, Mr. McRae and Mr. Lines attempted to negotiate the modification of the License Agreement which involved further communications to and from Massachusetts. Lines Aff. ¶ 14.

According to LBAI's own complaint filed with the Connecticut Superior Court, Mr. McRae personally worked on the business plan of LBAI's activities in the United States, including Massachusetts. Lines Aff. ¶ 15. In the same complaint, it is admitted that Mr. McRae and Mr. Lines had direct communications in 2003. *Id.* These activities of LBAI and McRae must be imputed to Leading Brands for purposes of jurisdiction. As a result, Leading Brands has transacted business in Massachusetts.

These contacts are fare more extensive than the minimum necessary to establish the "transacting any business" requirement. *See Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 982-83 (1st Cir. 1986) (holding British corporation subject to long-arm jurisdiction under Section 3(a) when a fraudulent misrepresentation claim arose from sending a single telex containing a false

representation to plaintiff in Massachusetts); *Bond Leather Co.*, 764 F.2d at 932 (finding defendant transacted business within the meaning of the Massachusetts long arm statute by mailing four letters and making one telephone call to Massachusetts); *Workgroup Technology Corporation v. MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102 (D. Mass. 2003) (finding defendant transacted business in Massachusetts based on telephone calls, emails and faxes sent to plaintiff in Massachusetts for the purpose of negotiating terms of a contract, even though plaintiff initiated negotiations).

With regard to the second prong of exercising jurisdiction under Section 3(a), Futuristic's causes of action clearly arise from the transaction of business by Leading Brands or LBAI and its agents in the Commonwealth. A plaintiff's cause of action arises from the defendant's transaction of business in Massachusetts if its claims are "made possible by, or li[e] in the wake of, the transaction of business in the forum State." *LTX Corp. v. Daewoo Corp.*, 979 F. Supp. 51, 55 (D. Mass. 1977). Here, all of Futuristic's causes of actions relate in one respect or another to the License Agreement. Likewise, all of Leading Brands' contacts in Massachusetts involve the negotiation and performance, or more appropriately non-performance, of the License Agreement.

## 2. *Leading Brands and Mr. McRae Caused Injury By an Act or Omission In the Commonwealth.*

A second basis of jurisdiction arises when a person directly or through an agent, causes tortious injury by an act or omission in the Commonwealth. Both Leading Brands and Mr. McRae assert that this provision does not apply. In this, they are wrong.

As noted in the fact section, Mr. McRae – and thereby Leading Brands – made a series of false representations to Futuristic here in the Commonwealth. While some of those

14

communications were sent from Canada, they were communicated directly into Massachusetts. As a result, § 3(c) applies. *Ealing Corporation v. Harrods, Ltd.*, 790 F.2d 978 (1st Cir. 1986). This interpretation is based on *Whittaker Corp. v. United Aircraft Corp.*, 482 F.2d 1079, 1084 (1st Cir. 1973) and *Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661, 663-64 (1st Cir. 1972) which held that a fraudulent misrepresentation is made in this state even if sent by mail or other communication modality.

### 3.    Leading Brands Caused Injury in the Commonwealth and Engaged in a Persistent Course of Conduct in the Commonwealth.

Leading Brands and McRae engaged in a persistent course of conduct that led to LBAI effectively ceasing operations. This conduct included siphoning away the funds of LBAI, denying LBAI the use of funds to comply with the terms of the Futuristic License Agreement, closing LBAI's principal office in Connecticut without opening a new office and terminating most of LBAI's employees. As a result of the foregoing actions, Futuristic has had its contracts with LBAI interfered with.

For tortious interference, the injury occurs at the place of injury, in this case where Futuristic is located, not where the conduct that causes the injury occurs. *E.g., Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1216-17 (11th Cir. 1999); *Transamerica Leasing, Inc. v. La Republica de Venez.*, 21 F. Supp. 2d. 47, 54 (D.D.C.). Thus, since Futuristic experienced the impact here in the Commonwealth when its contracts for its Mad Croc™ product were impaired, then the injury falls within § 3(d) given that Futuristic and Mr. Lines have been present in Massachusetts throughout the time period when Leading Brands and McRae engaged in this conduct.

Nor can it be gainsaid that the Complaint sets forth a continuing course of conduct. As supported by the affidavits, it appears that Mr. McRae's and Leading Brands' actions having taken place over more than a year. Thus, this is not a single incident, but a calculated course of action that continues to the present day.

## IV.    Exercise of Personal Jurisdiction over Leading Brands and McRae Comports with the Requirement of the Due Process Clause.

In the First Circuit, courts follow a tripartite constitutional analysis for determining the existence of personal jurisdiction. "First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's forum-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the gestalt factors, be reasonable." *Pritzker v. Yari*, 42 F.3d 53, 60-61 (1st Cir. 1994). *See United States v. Swill Am. Bank, Ltd.*, 191 F.3d 30, 36 (1st Cir. 1999).

### A.    The Claims Relate to Leading Brands' Forum State Activities.

Before turning to the specifics of relatedness in the current litigation, the Court must first address the nature of the application of those general factors to a case of this type. "Ordinarily, the personal jurisdiction analysis for tort claims differs from that for contract claims. *See Phillips Exeter Acad.* [*v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999)] (describing the distinction). When, however the tort is intentional interference with a contractual or business relationship, the two inquiries begin to resemble each other. Intentional interference with a contractual or business relationship concerning the sale of goods in New Hampshire is a

contact with New Hampshire for much the same reasons that the assumption of the contract is

such a contact. *Cf. Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1079-80 (10th Cir. 1995)

(observing that the Supreme Court's decision in *Burger King*, 'although specifically addressed to

a breach of contract claim, provides a useful framework' for a case involving intentional

interference with contractual relations)." *Jet Wine & Spirits, Inc. v. Bacardi & Co.*, 298 F.3d 1,

10-11 (1st Cir. 2002).

The First Circuit recently addressed the "relatedness" factor and clarified the issue of

causation.

> [W]e are persuaded that strict adherence to a proximate cause standard in
> all circumstances is unnecessarily restrictive. The concept of proximate
> cause is critically important in the tort context because it defines the scope
> of a defendant's liability. In contrast, the first prong of the jurisdictional
> tripartite test is not as rigid: it is, "relatively speaking, . . . a 'flexible,
> relaxed standard.'" *Sawtelle*, 70 F.3d at 1389 (citation omitted). We see
> no reason why, in the context of a relationship between a contractual or
> business association and a subsequent tort, the absence of proximate cause
> per se should always render the exercise of specific jurisdiction
> unconstitutional
>
> When a foreign corporation directly targets residents in an ongoing effort
> to further a business relationship, and achieves its purpose, it may not
> necessarily be unreasonable to subject that corporation to forum
> jurisdiction when the efforts lead to a tortious result. The corporation's
> own conduct increases the likelihood that a specific resident will respond
> favorably. If the resident is harmed while engaged in activities integral to
> the relationship the corporation sought to establish, we think the nexus
> between the contacts and the cause of action is sufficiently strong to
> survive the due process inquiry at least at the relatedness stage.

*Nowak v. Tak How Invs.*, 94 F.3d 708, 715-716 (1st Cir. 1996). The relatedness requirement of

the Due Process Clause is a flexible, relaxed standard which focuses on the nexus between the

plaintiff's claims and the defendant's contacts with the forum state. *Ticketmaster-New York, Inc.

v. Alioto*, 26 F.3d 201, 206 (1st Cir. 1994).

In the instant case, Leading Brands purposefully established contacts with Massachusetts in an ongoing effort to further a business relationship with Futuristic, which efforts culminated in the execution of the License Agreement. Having caused its subsidiary to breach that License Agreement, Leading Brands can reasonably be subjected to jurisdiction in Massachusetts on the claims that arise out of its interference with the License Agreement. As to the second element of purposeful availment, Leading Brands and McRae should have foreseen that their actions directed into Massachusetts in interference with the Futuristic License Agreement would give rise to a lawsuit in Massachusetts.

### B. Leading Brands Availed Itself of the Privilege Of Conducting Business in Massachusetts.

The Constitutional requirement of purposeful availment rests on two cornerstones – voluntariness and foreseeability. *See Ticketmaster*, 26 F.3d at 207. There is no doubt that the contacts of Leading Brands were voluntary. In negotiating the License Agreement on behalf of Leading Brands and LBAI, Mr. McRae continually communicated with Futuristic in Massachusetts. Because many of these communications were initiated by Mr. McRae, Defendants cannot seriously dispute that they were voluntary. *See Sawtelle*, 70 F.3d at 1389-90 (stating that the transmission of information into the forum state by way of telephone call or mail were unquestionably a contact for purposes of jurisdictional analysis). In fact, Mr. McRae did more than just direct communications to Massachusetts; on at least two occasions he traveled to Massachusetts in connection with business he had with Futuristic.

### C.    Futuristic's Claims Satisfy the "Gestalt Factors."

In weighing the exercise of personal jurisdiction, the Court must also consider the applicability of numerous other concerns, called in the First Circuit "gestalt factors." When it does so, the defects in Leading Brands' analysis become even clearer. Those factors are:

(1) the defendant's burden of appearing,

(2) the forum state's interest in adjudicating the dispute,

(3) the plaintiff's interest in obtaining convenient and effective relief,

(4) the judicial system's interest in obtaining the most effective resolution of the controversy, and

(5) the common interests of all sovereigns in promoting substantive social policies.

*Foster-Miller*, 46 F.3d at 150. All of those factors indicate that exercise of jurisdiction is proper.

As to the first factor, it will not be a substantial burden for Defendants to appear in Massachusetts. Indeed, Mr. McRae, Leading Brands' Chairman, President and CEO, has already traveled to Massachusetts on at least two occasions to conduct business on behalf of Leading Brands. Further, he will be involved in the state court litigation against LBAI as well as the LBAI litigation in Connecticut.

Turning to the second factor, Massachusetts has an interest in preserving corporations operating in its borders from the torts of others. Indeed, Massachusetts has a strong interest in keeping third parties from interfering in contracts that relate to Massachusetts. There is no other forum with a stronger interest.

The third and fourth factors are clear. Futuristic seeks a remedy from a United States Court for actions that have had an impact in the United States. There is no equity at all in forcing Futuristic to bring suit in Canada. Similarly, given that there is already litigation and an

19

arbitration involving LBAI here in Massachusetts, this forum is the most effective for complete relief. The fifth factor has little impact in this case.

### V.    *At the Minimum, Futuristic Should Be Allowed Discovery on Personal Jurisdiction.*

Much of the information concerning the relationship of Leading Brands, LBAI, and Mr. McRae is locked up in their respective files. Internal corporate relationships are paradigmatic of information that can only be obtained by discovery. Even if Futuristic has not completely satisfied this Court that jurisdiction exists, it has more than adequately justified discovery on the issue of jurisdiction.

### CONCLUSION

For the foregoing reasons, Futuristic respectfully requests that the Court deny Defendants' motion to dismiss for lack of personal jurisdiction.

FUTURISTIC BRANDS USA, INC.

By its attorneys,

*Richard P. O'Neil*
Evan Slavitt (466510)
Richard P. O'Neil (645214)
Bodoff & Slavitt LLP
225 Friend Street
Boston, MA 02114
(617) 742-7300

Date: May 26, 2004

### CERTIFICATE OF SERVICE

I hereby certify that I have caused to be delivered a copy of the foregoing on the date set forth above to all counsel of record by first class mail.

*Richard P. O'Neil*